STATE of Minnesota, Respondent,

v.

Ben Archie BRAYLOCK, Jr., Appellant.

No. C9–92–1265.

Supreme Court of Minnesota.

June 18, 1993.

Sonja G. Lemmer, Sp. Asst. State Public Defender Dorsey & Whitney, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty. and Linda K. Jenny, Asst. County Atty., Minneapolis, for respondent.

SIMONETT, Justice.

Ben Archie Braylock, Jr., and James Ferguson were each convicted of first degree murder and attempted first degree murder in a joint jury trial. The jury was given an aiding and abetting instruction. Each defendant was sentenced to concurrent sentences of life imprisonment and 180 months, respectively, for the two crimes. In this appeal by defendant Braylock, the appellant claims the evidence was insufficient to show premeditation and insufficient to prove that he had not acted in self-defense. He further claims that prosecutorial misconduct requires, in any event, a new trial. We affirm.

About 8:45 p.m. on November 11, 1991, Tony Jenkins was in his station wagon, parked in front of an apartment building at 3112 First Avenue South in Minneapolis. First Avenue is a one-way street running north; the Jenkins vehicle was parked on the west (left) side of the street, facing north. Jenkins, age 19, was in the driver's seat. Next to him in the front seat was Ray Kennedy, age 18. In the back seat were Jay Toliver, age 18, and his girlfriend, Farrah Kennedy, age 14. Outside the car were two teen-age girls, friends of the group. Ray Kennedy's mother lived in one of the units in the apartment building, and that day, with the help of family and friends, was in the process of moving to a different address.

While this group was preparing to go to a movie, defendant Archie Braylock, age 19, and James Ferguson, age 25, along with Braylock's half-brother, Anthony Weisman, came walking south along the west sidewalk towards the parked Jenkins station wagon. As the three men drew close to the station wagon, shots were fired. Ray Kennedy, sitting in the right front seat of the station wagon, was killed with one shot. Tony Jenkins, the driver, was shot three times but survived. Braylock, Ferguson and Weisman fled the scene. At trial, the state claimed the shooting of the two victims was unprovoked and premeditated; the defense claimed Jenkins had fired first, and that Braylock and Ferguson had only returned fire in self-defense.

Witnesses for the state testified that defendant Braylock had made numerous death threats against Tony Jenkins. There was evidence of similar threats against Ray Kennedy. Braylock is Ferguson's uncle; both were members of a south Minneapolis gang; and both had owned and carried guns for many years. Witnesses testified that Braylock had been looking for Jenkins earlier that same day and had even called Ray Kennedy's girlfriend to see if she knew where Jenkins was. Also that day, Jenkins had purchased a used vehicle, the white station wagon, to replace his Nova, so he would be less recognizable when driving in the neighborhood.

The persons in and around the parked station wagon testified the shooting was unprovoked by any of them. Indeed, Jenkins testified that he tried to drive away, but struck the rear of an unoccupied car parked just ahead of his station wagon. (Damage to the wagon and the two vehicles parked directly in front of it confirmed this.) Jenkins further testified that Ferguson approached the driver's side of the station wagon, said, "What's up, punk?", and immediately began firing through the raised glass window by the driver's side. Other testimony indicated that Ferguson fired the shots into the front seat, first hitting Ray Kennedy in the back of the head, and then hitting Tony Jenkins three times in the left side as Jenkins leaned over to shield Kennedy. There was other testimony that at the same time Ferguson fired into the front seat, defendant Braylock shot through the rear side window on the driver's side, but did not hit either of the two rear seat passengers. Braylock appar-

ently took off running before Ferguson did.

Anthony Weisman, who was with Braylock and Ferguson, fled the scene at the onset of the gunfire, heading north back to the Food–N–Fuel store where Ferguson's car was parked. The Food–N–Fuel store is at the corner of 31st Street and First Avenue South, about half a block to the north of where the station wagon was parked. Apparently, Weisman first picked up Ferguson, then the two of them retrieved Braylock a few blocks south of the crime scene. On December 6, 1991, Braylock and Ferguson were eventually discovered staying together at the Dakota County home of Braylock's aunt, and arrested. There was testimony that between November 11 and December 6, Braylock had threatened potential witnesses.

Both Braylock and Ferguson testified at the trial. The defendants claimed they had reason to fear Jenkins, not the other way around. Braylock testified that Jenkins had once driven slowly by him at a Burger King, lowering his car window ominously, but then driving on. Later, testified Braylock, Jenkins told him that he had been lucky that day at Burger King because "Ray told me not to do it." Ferguson, too, testified about incidents which led him to believe Jenkins might shoot him. Finally, a defense witness testified there were rumors on the street that Jenkins was out to get both Braylock and Ferguson.

The defense version of the shooting incident is quite different from that presented by the prosecution. Braylock and Ferguson said they had stopped at the Food–N–Fuel to buy a bag of chips and some gum. Braylock then allegedly decided to walk down the block to visit his girlfriend, who had told him that day she was pregnant and who apparently was visiting at the Kennedy apartment. Braylock and Ferguson testified that as they walked towards the apartment, they did not know the station wagon belonged to Jenkins and did not see him in the driver's seat until they were only two car lengths away.

Both Braylock and Ferguson testified that Tony Jenkins first fired at them twice through the opening at the hinged end of the partially ajar driver's car door. Ferguson says he fired back twice, and Braylock says he fired two or three times; however, both men denied taking special aim, admitting only that they shot at the car. Jenkins, on the other hand, testified that Ferguson kept moving closer to the car and shooting, even as Jenkins was saying, "That's enough, that's enough." Testimony indicated that six shots were heard. The two people in the back seat of the car and the two young teenagers outside the car testified that the shots were followed by a "click, click, click" of the hammer on an empty chamber.

Forensic evidence indicated that neither victim was hit in the front of his body, which tends to prove they were not facing their assailants. The damage to the car windows indicated shots were fired only from outside the car into the car. No guns were found at the scene, either inside or outside the car. Jenkins testified he had left his gun in his Nova. Police did find bullets in Kennedy's and Toliver's pockets, as well as on Jenkins (plus one bullet lying outside the car on the passenger side). There were no shell casings on the ground. No spent bullets or bullet holes were found anywhere outside the car in the area where Jenkins' gunshots would likely have struck had he actually fired a gun.

Among several bystander witnesses was a community supervising agent who happened to be in the neighborhood to meet with a client. He testified that he was parked about 30 yards behind the white station wagon when the incident occurred, and that he had ducked down in the front seat of his car as soon as the shooting started. It was his impression that the gunfire he heard came from in front of and to the left of him—in other words, from outside the station wagon. The agent called the police on his car phone, which accounted for the police arriving within "2 minutes" of the shooting. Another witness (who was dating a close relative of the defendants) was across the street from the shooting, and she testified she saw one of the girls take something wrapped in a

white towel out of the station wagon and run into the apartment building with it. The defense suggested this was Jenkins' gun; however, no other witnesses corroborated this testimony, and there was evidence that the entrance door to the apartment building was locked.

■ Our role on appeal is limited. We must review the evidence in the light most favorable to the jury's verdict, and we assume that the jury believed the state's witnesses and disbelieved contrary evidence. *See, e.g., State v. Moore,* 481 N.W.2d 355, 360 (Minn.1992); *State v. Ulvinen,* 313 N.W.2d 425, 428 (Minn.1981); and *State v. Wahlberg,* 296 N.W.2d 408, 411 (Minn. 1980). We do not sit as another jury to weigh the evidence again; we only decide whether there was competent, credible evidence from which the jury could find as it did.

Defendant Braylock first argues that he fired in self-defense. He claims he was walking down the sidewalk to visit his girlfriend, and that only as he neared the apartment building did he recognize Tony Jenkins, a person who had threatened him, sitting in the parked station wagon with the driver's door partly open. Then, according to Braylock, at the same time as he recognized Jenkins, Jenkins pointed a gun at the defendants and fired twice. Defendant Braylock says he did not retreat, as he feared being shot in the back; instead, he fired at the station wagon without specifically aiming at anyone.

■ Once a claim of self-defense is raised, it is the state's burden "to establish beyond a reasonable doubt that the killing was not justifiable." *State v. Austin,* 332 N.W.2d 21, 23 (Minn.1983). Here defendant's theory of self-defense simply does not stand up in light of the evidence presented by the state.

■ First of all, the jury apparently and reasonably disbelieved the defendants' story that they had been fired upon first by Jenkins, and instead believed Jenkins, who testified he was unarmed. The physical facts bear out Jenkins' testimony. No gun was found in the station wagon. Other witnesses say all the gunfire came from outside the car, and the damage to the car windows also so indicated.

Moreover, if the two defendants were as frightened and fearful of Jenkins and Kennedy as they claim, the jury may have thought it odd that the two men would choose to walk from Food–N–Fuel to an apartment where they might expect to find Jenkins and Kennedy. The jury could have concluded that nobody fired any shots at Braylock and Ferguson as they approached the station wagon; that, instead, it was the defendants who were the aggressors; that Ferguson said to Jenkins, who had been unsuccessful in getting his car away from the curb, "What's up, punk?", and then fired a series of shots into Kennedy and Jenkins, while Braylock fired into the back seat. Ferguson disputes Jenkins' testimony that he heard a "click, click, click" from Ferguson's gun because, says Ferguson, he had a semi-automatic pistol which does not "click." Ferguson, however, never produced the gun at trial.

■ In light of all the evidence, especially the forensic and physical evidence and the testimony of the impartial eyewitnesses, the jury fairly concluded beyond a reasonable doubt that defendants did not fire in self-defense.

Defendant Braylock next argues that the state did not prove premeditation beyond a reasonable doubt. If the defendants did not act in self-defense—as the jury found—then the jury could well have found that the shooting of Kennedy and Jenkins was premeditated. The jury believed that Braylock had been threatening Jenkins and Kennedy and, on November 11, was looking for them. The jurors must have considered significant the fact that the two defendants parked their car half a block from the Kennedy apartment; that they then walked down the sidewalk, both with guns, directly towards the apartment where they had reason to believe they might find Jenkins and Kennedy; and that when they saw Jenkins and Kennedy in the parked station wagon, the two defendants immediately and repeatedly fired at the people in the car. Kennedy was shot in the back of the head,

while the three shots fired into Jenkins' left side formed a grouping only about 2 inches in diameter, indicative of aimed shooting. Ferguson continued to pull the trigger even after Jenkins said, "[T]hat's enough."

Defendant Braylock points out that he (as well as co-defendant Ferguson) was acquitted by the jury of charges of attempting to take the life of Jay Toliver, the back seat passenger. It does not follow from this acquittal, however, that defendants did not have in mind the shooting of the front seat occupants and that defendant Braylock aided and abetted that shooting.

From the evidence presented, the jury could have concluded—as it did—that the shootings were intentional and premeditated, carried out with a "cool mind"; that "some appreciable time" elapsed between the time when the defendants decided to shoot Jenkins and Kennedy and the actual shooting, during which time the shooting was considered, planned, prepared or determined to be committed. *See Moore*, 481 N.W.2d at 360–61.

Finally, defendant Braylock claims certain selected comments or statements made by the prosecutor in her closing argument constituted prejudicial misconduct. We disagree. We do not think the comments complained of were improper, having in mind the context and circumstances involved. *See State v. Booker*, 348 N.W.2d 753, 755 (Minn.1984) (allegedly improper statements must be examined within the context of entire summation).

The prosecutor covered a great mass of evidence in a straightforward fashion. Defense counsel vigorously argued their case, and the trial court gave the standard instruction to the jury to be governed by the facts. We are satisfied the state's summation was a fair submission, as apparently did defense counsel who took no objections. *See State v. Daniels*, 332 N.W.2d 172, 180 (Minn.1983) (failure to object presumed to indicate defense counsel found nothing improper).

We should add that appellant's pro se brief, which we have carefully considered, affords us with no basis for disturbing the jury's verdicts.

Affirmed.